# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

Plaintiff,

Case No. 05-C-194

-vs-

V & J FOODS, INC. and
V & J EMPLOYMENT SERVICES,

Defendants.

# DECISION AND ORDER

## INTRODUCTION

The Equal Employment Opportunity Commission ("EEOC") brought this action on behalf of Samekiea Merriweather, age 16, who allegedly suffered sexual harassment and retaliation while employed at the defendants' Burger King restaurant located at 35th and Vliet in Milwaukee. The defendants, V&J Foods, Inc. and V&J Employment Services (collectively V&J), have moved for summary judgment.

The EEOC presses claims for hostile work environment, quid pro quo or "tangible job action" harassment, and retaliation. The allegations in the complaint, and the evidence presented in opposition to V&J's motion for summary judgment, set forth a disturbing version of events involving the harassment and termination of a teenage girl by a supervisor more than twice her age. However, because of Merriweather's failure to fulfill her duty to avoid harm by notifying V&J of her harasser's conduct, V&J cannot be

held accountable under Title VII. Furthermore, EEOC has not produced sufficient evidence to support its claim that Merriweather was terminated either because she rejected her harasser's advances or because she complained about the harassment. Therefore, V&J's motion is granted.

**FACTUAL BACKGROUND**[1]

## I.     Commencement of Employment; Orientation and Training

Samekiea Merriweather ("Merriweather") was hired by V&J in late January 2003. (Plaintiff's Proposed Findings of Fact ["PPFF"], ¶ 73). Born November 15, 1986, she was sixteen at the time. It was her first job outside the home. Merriweather was hired to work at the Burger King located at 35th and Vliet in Milwaukee, store number 3219. (PPFF, ¶ 80). Merriweather hoped to stay at Burger King and move up to management in the future. (PPFF, ¶ 79; Defendant's Response ["DR"] to PPFF, ¶ 79).

Merriweather was hired by and reported to Anthony Wilkins ("Wilkins"), General Manager at the 35th and Vliet Burger King. (PPFF, ¶¶ 80-81). Wilkins was born October 9, 1967, making him 35 years old at that time. Wilkins knew that Merriweather hoped to move into management, and he told her at various times that she was on the management track. (PPFF, ¶¶ 83-84).

Mary Blake ("Blake"), Training Director at V&J, is responsible for training store managers. New managers and managers in training receive sexual harassment training

---

[1] Unless otherwise noted, the following facts are undisputed for purposes of this motion.

from Blake. Additionally, all V&J managers receive mandatory sex harassment training each year. V&J's Management Handbook contains sexual harassment policies.

Hourly employees also receive sexual harassment training during orientation, with orientations occurring weekly. Merriweather completed this orientation, at which time she received an employee handbook. (Defendant's Proposed Findings of Fact ["DPFF"], ¶ 26). Despite participating in orientation, Merriweather alleges that she never received the appropriate training during orientation. (DPFF, ¶ 5; Plaintiff's Response ["PR"] to DPFF, ¶ 5). According to Merriweather,

> During my orientation when I started at V&J, I did not receive any training regarding sexual harassment. All that was said basically was, 'sexual harassment, well, you all know what that is.' There was no video on sexual harassment, and nobody went over the policy in the Orientation Handbook they gave me.

(Merriweather Affidavit, ¶ 29). However, Merriweather admits that she was obligated to review the employee handbook which she received during orientation and which contained the applicable sexual harassment policies. (PR to DPFF, ¶ 26).

The Orientation Handbook, which was received by Merriweather, has a sexual harassment policy statement and a rule regarding sexual harassment. A hotline telephone number to the V&J corporate office is printed on the front cover of the Orientation Handbook. (DPFF, ¶ 7; PR, ¶ 7). This number was also printed on every check stub issued to Merriweather. (DPFF, ¶ 8; PR, ¶ 8). Merriweather claims that her orientation did not include a phone number to call regarding problems at work. However, she does not dispute that the number was on the checks or on the cover of the Orientation Handbook, which she received and was obligated to review. Instead, Merriweather claims that she was not "told about" the number. (PR, ¶¶ 7-8). Employees are told

during orientation that if a person's boss is the alleged harasser, the employee is to call the office or tell the alleged harasser's boss what is going on. (DPFF, ¶ 66).

## II.    First Term of Employment and Termination

Merriweather first worked at the 35th Street Burger King location from February to early August 2003. According to Merriweather, Wilkins snapped the back of Merriweather's bra in April or May of 2003. (PPFF, ¶¶ 146-47; DR to PPFF, ¶¶ 146-47). Merriweather was offended by Wilkins' actions and told him that she did not appreciate it and that he should not do it again. The incident was unappreciated, unwelcome, and made Merriweather uncomfortable.

On more than one occasion, Wilkins offered Merriweather rides home from work in his car. (PPFF, ¶ 151; DR to PPFF, ¶ 151). Merriweather walked to work and lived between 10 and 14 blocks away from the store location. The store is located in an unsafe area of town. (DPFF, ¶ 30). Merriweather considered these offers unwelcome and she told him to stop offering them, although the record indicates that she asked for a ride home on at least one occasion. (DR to PPFF, ¶ 153).

Wilkins also called himself Merriweather's "daddy" in front of other employees. (PPFF, ¶ 155; DR to PPFF, ¶ 155). Merriweather told Wilkins that he was not her daddy, and that her daddy was in Minnesota. Wilkins scheduled Merriweather to work alone with him on weekend mornings. According to Merriweather, on one of these occasions, Wilkins told her that he wanted her and wanted to date her. (PPFF, ¶ 158; DR to PPFF, ¶ 158). He said that he wanted a young girl, like his father had, because their bodies were not used up. (PPFF, ¶ 159; DR to PPFF, ¶ 159). He also used these weekend sessions to rub against her as he would reach for things. (PPFF, ¶ 160; DR to PPFF, ¶ 160). He

made contact with her in this manner at least twice, inside the coolers and in the kitchen area by the grill. (PPFF, ¶ 161; DR to PPFF, ¶ 161). Wilkins also attempted to kiss Merriweather as he walked by her in the back of the restaurant, and she resisted by moving away. (PPFF, ¶ 162; DR to PPFF, ¶ 162). Wilkins commented on the fit of Merriweather's uniform in a sexual way and told Merriweather that he had intentionally ordered her shorts small. (PPFF, ¶ 163; DR to PPFF, ¶ 163). Merriweather asked Wilkins to keep his business to himself, told him that she was not interested in him, and that she had a boyfriend. (PPFF, ¶ 167; DR to PPFF, ¶ 167).

Merriweather allegedly told Dolores McBride ("McBride"), one of the shift managers at 35th Street, about Wilkins' harassment. (PPFF, ¶ 168; DR to PPFF, ¶ 168 [referencing DPFF, ¶¶ 14, 15, 64]). Merriweather told McBride what Wilkins had been saying and that Wilkins had popped her bra strap. (PPFF, ¶¶ 169-70; DR to PPFF, ¶¶ 169-70). McBride pointed out to Merriweather that Wilkins was showing favoritism to Merriweather and other girls. (PPFF, ¶ 174; DR to PPFF, ¶ 174). According to Merriweather, McBride's advice was that Tony liked her and that she should either cuss him out or "go with it." (PPFF, ¶ 176; DR to PPFF, ¶ 176). McBride denies that Merriweather told her anything about Wilkins' alleged harassment. (DR to PPFF, ¶¶ 168-177).

Merriweather also allegedly told Assistant Manager Vernell Staten ("Staten") about the bra strap incident. (PPFF, ¶ 178; DR to PPFF, ¶ 178). She told Staten about how Wilkins was always around her and was trying to pick her up from work late at night. (PPFF, ¶ 179; DR to PPFF, ¶ 179). Staten's response was to giggle and laugh. (PPFF, ¶ 179; DR to PPFF, ¶ 179). Staten denies that Merriweather told her anything

about Wilkins' alleged harassment. (DR to PPFF, ¶¶ 178-80). Finally, Merriweather claims that she told another shift manager named "Denise" the same things she told Staten. (PPFF, ¶ 181; DR to PPFF, ¶ 181). Merriweather is not aware of any action that "Denise" took regarding her complaints. (PPFF, ¶ 182; DR to PPFF, ¶ 182).

Merriweather was terminated by Wilkins sometime in August 2003 for violation of a no-call/no-show policy. (PPFF, ¶ 183; DPFF, ¶ 20). Merriweather had missed work to visit her sick grandmother. (PPFF, ¶ 182; DR to PPFF, ¶ 182). Wilkins asked Merriweather to call into work after she visited her grandmother, which Merriweather failed to do. (DPFF, ¶ 48). An individual can be terminated for one no-call/no-show instance within the employee's 90-day probationary period. (DPFF, ¶ 56).

## III. Second Term of Employment and Termination

After a week or so, Merriweather was re-hired by Wilkins. (PPFF, ¶¶ 188-190; DR to PPFF, ¶¶ 188-90). Wilkins told Merriweather that he was going to "be right" and apologized for what he put her through. (PPFF, ¶ 190). However, according to Merriweather, Wilkins continued to harass her during her second term of employment. One day, he called her into his office and said that he wanted her body. (PPFF, ¶ 192; DR to PPFF, ¶ 192). Wilkins told her he wanted to take her to a hotel to model lingerie. (PPFF, ¶ 193; DR to PPFF, ¶ 193). Wilkins said he would pay her, rent her a car, and she could have whatever she wanted. (PPFF, ¶ 194; DR to PPFF, ¶ 194). Merriweather rejected this proposal by walking out, telling him to keep it to himself, and going back to work. (PPFF, ¶ 196; DR to PPFF, ¶ 196). Wilkins, who had promoted Monique Carson ("Carson") to shift manager, told Merriweather she would have had Carson's spot if she had been "acting right." (PPFF, ¶ 198-99; DR to PPFF, ¶ 199). He also told

Merriweather he could have sex better than her boyfriend. (PPFF, ¶ 201; DR to PPFF, ¶ 201).

One night, Merriweather worked until 1 a.m. and Wilkins gave her a ride home. (PPFF, ¶ 202). According to Merriweather, Wilkins complained that he was doing things for her and he was not going to do anything else because she was giving her body away for free to her boyfriend when he was trying to pay her. (PPFF, ¶ 203; DR to PPFF, ¶ 203).

Merriweather also noticed that Wilkins was growing increasingly hostile towards her. (PPFF, ¶ 206; DR to PPFF, ¶ 206). He seemed to be violent and wanted to talk crazy to her, telling her to punch out and "go home." (PPFF, ¶¶ 207-08; DR to PPFF, ¶¶ 207-08). Wilkins told her she talked "too damn much" and he was going to get rid of her soon. (PPFF, ¶ 209; DR to PPFF, ¶ 209). Carson noticed that Wilkins was acting mean toward Merriweather, criticizing her and nitpicking her performance. (PPFF, ¶ 210; DR to PPFF, ¶ 210).

Merriweather told Carson about Wilkins' behavior. (PPFF, ¶ 216; DR to PPFF, ¶ 216). Specifically, Merriweather told Carson that Wilkins called himself her daddy, that Wilkins brushed past her on purpose, and that Wilkins asked her to model lingerie at a hotel and offered her money. (PPFF, ¶¶ 217-20; DR to PPFF, ¶¶ 217-20). Merriweather also told Staten about the harassment by Wilkins. (PPFF, ¶ 221; DR to PPFF, ¶ 221). Merriweather asked Staten for a phone number at V&J to call and complain about Wilkins. (PPFF, ¶ 224; DR to PPFF, ¶ 224). Staten gave her a number, but it turned out to be the wrong number, and Staten was unable to give her a correct one. (PPFF, ¶¶ 225-

27; DR to PPFF, ¶¶ 225-27).[2]  No one at V&J's corporate office was contacted about Wilkins's alleged harassment of Merriweather either before or after her termination. (DPFF, ¶ 27).  Furthermore, Merriweather knew Pete Breitigam ("Breitigam"), Wilkins' immediate supervisor, and had seen Breitigam in the store location where she works. Complainant never reported any allegations of sexual harassment to Breitigam.  (DPFF, ¶¶ 38, 68).

In September 2003, Merriweather heard from Wilkins that V&J President Valerie Daniels-Carter ("Daniels-Carter") would be visiting the 35th Street Burger King location. Merriweather helped clean and prepare the restaurant for the visit.  She discussed the impending visit with McBride and some others at the restaurant.    Merriweather and McBride agreed that Merriweather would talk to Daniels-Carter about Wilkins' behavior. (PPFF, ¶ 232; DR to PPFF, ¶ 232).  According to Wilkins, McBride was his "eyes and ears" on the restaurant floor, and any time something was said to McBride, McBride told Wilkins.  (PPFF, ¶ 233; DR to PPFF, ¶ 233).

Merriweather arrived for work at the appropriate time for her scheduled shift the morning of Daniels-Carter's scheduled visit, only to find that she was no longer on the schedule.  Instead, Merriweather was scheduled to work later that day.  (DPFF, ¶ 49). Carson told Merriweather that Wilkins had changed the schedule that morning.  (PPFF, ¶¶ 237-38; DR to PPFF, ¶¶ 237-38).  Merriweather was extremely upset about the schedule change, and she showed the old schedule, which had been placed in the trash, to Staten

---

[2] V&J points to evidence in the record suggesting that Merriweather did not make any complaints of harassment prior to her second and final termination.  (DR to PPFF, ¶¶ 216-221; DPFF, ¶¶ 14, 15, 24, 33, 34).  This evidence does not directly contradict Merriweather's version of events.  In any event, construing the evidence in the light most favorable to the plaintiff, the Court is obliged to accept Merriweather's version.

and Wilkins. She complained to Wilkins that he was not allowed to change the schedule on short notice without informing her.

Merriweather went home and reported the schedule change to her mother. Merriweather did not return to work her scheduled shift later that day. Instead, Merriweather's mother came to the restaurant and told McBride that Wilkins had been sexually harassing her daughter. McBride relayed the incident to Wilkins. (PPFF, ¶ 255; DR to PPFF, ¶ 255). When she learned of the incident, Merriweather told McBride not to listen to her mother's complaints. (DPFF, ¶ 16).

Merriweather returned to the restaurant the next payday, which was the following Monday. She was not on the work schedule. Wilkins told Merriweather she was fired because she had brought her mother into her business. (PPFF, ¶ 258; DR to PPFF, ¶ 258). Merriweather accused Wilkins of sexually harassing her and others at the restaurant. Wilkins refused to admit these allegations and told Merriweather to get out of his office. Merriweather told Wilkins that she was going to file a sexual harassment charge at EEOC. Wilkins and Staten told Merriweather she did not have to go to EEOC, and that she could have her job back. Merriweather refused the offer.

## IV. Post-Termination; EEOC Investigation; Commencement of Lawsuit

After her termination, Merriweather, Shawana Hollins, and an unidentified shift manager from 35th and Vliet looked up V&J Vice President Mary Blake's phone number in the white pages. Merriweather called Blake with the others on the line. They collectively tried to complain to Blake about Wilkins, but Blake would not listen. Blake was annoyed that she had been called at home. No one else at V&J's corporate office

was contacted about Wilkins's alleged harassment of Merriweather either before or after her termination. (DPFF, ¶ 27).

Merriweather filed her charge of discrimination with EEOC on October 1, 2003, alleging discrimination based on sex and retaliation. Following an investigation, conciliation failed, and the EEOC filed this lawsuit on February 17, 2005.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

EEOC pursues three theories of recovery: (1) hostile work environment; (2) tangible job action (or "quid pro quo") harassment; and (3) retaliation. The Court will consider each claim separately.

## I. HOSTILE WORK ENVIRONMENT

The *prima facie* elements of a hostile work environment claim are: (1) plaintiff was subjected to unwanted sexual harassment; (2) the harassment was based on her sex; (3) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability. *See Moser v.*

*Indiana Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005). V&J disputes the third and fourth elements.

### A. Harassment

To evaluate whether a plaintiff's work environment was hostile, courts examine all of the circumstances, such as the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Courts evaluate those factors from both an objective and subjective viewpoint: "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation." *Id.* (quoting *Harris*, 510 U.S. at 21-22).

The difficult distinction to be made is between conduct which is merely vulgar and conduct which is so severe as to affect the terms and conditions of the victim's employment. On the actionable side lies "sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). EEOC has provided evidence that Wilkins made uninvited physical contact with Merriweather (snapping her bra, brushing up against her). EEOC has also provided evidence that

Wilkins made repeated and uninvited sexual solicitations. According to Merriweather, Wilkins told her that he wanted her and wanted to date her, in particular because she was young and her body was not "used up." Wilkins also asked Merriweather to go to a motel to model lingerie and to engage in sexual acts, even offering her money to do so. Accepting as true Merriweather's version of the events, which the Court must do at this stage of the proceedings, this evidence is sufficient to avoid summary judgment. *See, e.g., Quantock v. Shared Marketing Services, Inc.*, 312 F.3d 899 (7th Cir. 2002) (outright solicitation of numerous sex acts was more severe than "occasional vulgar banter, tinged with sexual innuendo," and a reasonable jury could find propositions sufficiently severe, as an objective matter, to alter terms of employment).

V&J argues that the conduct was not subjectively hostile because Merriweather voluntarily returned to the same work environment with Wilkins after her first termination. However, evidence in the record suggests that Merriweather decided to return, at least in part, only after receiving assurances that Wilkins would "be right" and discontinue his harassment. Furthermore, Merriweather allegedly made frequent complaints to managers and co-workers, and EEOC has presented evidence that Merriweather found Wilkins' conduct unwelcome and offensive. Such evidence is more than enough to create a triable issue of fact. *See, e.g., Quantock*, 312 F.3d at 904 (evidence that Quantock reported the conduct to a supervisor, sought treatment from a psychologist, and was humiliated sufficient to create triable issue on subjectivity).

Finally, the relative ages of Wilkins (35) and Merriweather (16) has great significance. As the Seventh Circuit recently observed in a case where the alleged harasser was twenty-five years old and the victim was sixteen years old, an "employer of

teenagers is not *in loco parentis*, but he acts at his peril if he fails to warn their parents when he knows or should know that their children are at substantial risk of statutory rape by an older, male shift supervisor in circumstances constituting workplace harassment." *Doe v. Oberweis Dairy*, 456 F.3d 704 (7th Cir. 2006). Merriweather's age, especially in relation to Wilkins' age, along with Wilkins' repeated physical contact with Merriweather and his direct solicitation of sex from Merriweather, combine to state an actionable claim of harassment.

### B. Employer Liability

Employers are vicariously liable for hostile environment harassment perpetrated by a supervisor, and there is no doubt or dispute that Wilkins was Merriweather's supervisor. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998). Where a plaintiff has suffered no tangible employment action, which the Court will presume for this portion of the analysis,[3] the employer is entitled to establish an affirmative defense as follows: (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765.

As for the first element, it is undisputed that Merriweather participated in sexual harassment training during her orientation. Even though Merriweather claims that no one explained the materials to her, she acknowledges that she received the orientation

---

[3] The quid pro quo claim, discussed in the next section, is based on the allegation that Merriweather was terminated because she refused Wilkins' advances.

handbook and that she was obligated to review it. It is also undisputed that the hotline number to V&J's corporate office was printed on the cover of the orientation handbook as well as on each and every pay stub Merriweather received. Finally, V&J supervisors, including Wilkins, receive training in sexual harassment during their orientation and annually thereafter. Therefore, V&J exercised reasonable care to prevent harassing behavior at its workplace.

As for the second element, it is undisputed that Merriweather failed to make any formal complaints about Wilkins to V&J's corporate office, in accordance with V&J's formal complaint procedures, at any time prior to her termination. "Since an employer is not omniscient, it must have notice or knowledge of the harassment before it can be held liable." *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003). EEOC presents evidence that Merriweather made complaints to other individuals at 35th and Vliet, including shift and assistant managers like McBride, Staten, and Carson. While it is true that compliance with a designated complaint procedure is not the sole means by which an employee can fulfill her duty, the affirmative defense still applies if the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer *or to avoid harm otherwise*." *Ellerth*, 524 U.S. at 765 (emphasis added).

The complaints made to Wilkins' subordinates were insufficient to notify V&J that Wilkins was harassing Merriweather. Knowledge of Wilkins' behavior cannot be imputed to V&J based on complaints made to individuals who worked below Wilkins. Those individuals were not in a position to initiate an investigation or to discipline Wilkins in any way. As the Supreme Court noted in *Faragher*, Title VII's "'primary

objective,' like that of any statute meant to influence primary conduct, is not to provide redress but to *avoid harm*." *Faragher*, 524 U.S. at 806 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (emphasis added)). In fact, the procedures in place, as noted by the EEOC, did not give supervisors any direction on how to act when a supervisor was accused of harassment. The responsibility for reporting such conduct to V&J is allocated to its hourly employees. (DPFF, ¶ 66). Therefore, Merriweather's complaints cannot establish employer liability because they were incapable of providing V&J with the knowledge and the means to avoid future harassment.[4] Such a holding is consistent with "the general theory of damages, that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize damages' that result from violations of the statute." *Faragher* at 806 (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 n.15 (1982)).

Furthermore, while Merriweather disputes being told during her orientation that she was supposed to complain about supervisor harassment to the corporate office (or to someone superior to Wilkins), the evidence suggests that Merriweather knew that this was her responsibility. Merriweather devised a plan to talk to V&J President Daniels-Carter the day she was terminated. Also, when Merriweather complained to Staten, Staten referred Merriweather to a number for the corporate office. It does not matter that the number ended up being incorrect. A reasonable person in Merriweather's position

---

[4] *Loughman v. Malnati Organization, Inc.*, 395 F.3d 404 (7th Cir. 2005), cited by EEOC, is distinguishable. In *Loughman*, a complaint made to a shift manager, instead of to "upper management" as specified by the complaint procedure, was held sufficient to give the company notice of the harassing behavior. However, *Loughman* involved co-worker harassment, not supervisor harassment. *Loughman*, 395 F.3d at 408. Therefore, the shift manager in *Loughman* was in a position to initiate an investigation, and knowledge could be imputed to the company.

should have pursued the matter further and discovered the correct number. In any event, what matters most is that the complaint did not reach V&J, and therefore V&J did not have notice of Wilkins' harassing behavior. Merriweather had constructive and actual knowledge that her complaint was supposed to go to V&J's corporate office, yet Merriweather failed to initiate such a complaint until after she left V&J.

Therefore, while EEOC has presented sufficient evidence to demonstrate that Merriweather was subjected to a legally actionable hostile work environment, V&J avoids liability under the affirmative defense set forth in *Ellerth/Faragher*.

## II.    *QUID PRO QUO* SEXUAL HARASSMENT

EEOC also proceeds under a *quid pro quo* theory of sexual harassment – that Merriweather was terminated because she rebuffed Wilkins' pursuit of a sexual relationship. A *prima facie* claim for *quid pro quo* sexual harassment involves the following elements: (1) plaintiff is a member of a protected group; (2) the sexual advances were unwelcome; (3) the harassment was sexually motivated; (4) plaintiff's reaction to the advances affected a tangible aspect of her employment; and (5) respondeat superior has been established. *See Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996); *Crosson v. Caremark, Inc.*, 212 F. Supp. 2d 875, 881 (N.D. Ill. 2002). While the Supreme Court has downplayed the traditional distinction between *quid pro quo* and hostile work environment claims under Title VII, the distinction remains relevant in determining whether the plaintiff can establish a *prima facie* case. *See Ellerth*, 524 U.S. at 753; *see also Crosson*, 212 F. Supp. 2d at 882 n.4.

EEOC presents no direct evidence that Merriweather was terminated because she spurned or rejected Wilkins' sexual advances. *See Rogers v. City of Chicago*, 320 F.3d

748, 753 (7th Cir. 2003) (citing *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001)) (Direct evidence of discrimination is evidence that, "if believed by the trier of fact would prove [discrimination] 'without reliance on inference or presumption'"). Instead, EEOC relies on circumstantial evidence. Circumstantial evidence can be used to "infer intentional discrimination by the decision-maker." *Rogers*, 320 F.3d at 753. The most common type of such evidence consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Taken separately or in combination, circumstantial evidence can compose a "convincing mosaic of discrimination against the plaintiff." *Id.* at 737.

EEOC's theory is that Wilkins was "messing with" Merriweather's schedule in an effort to upset her. Specifically, on the day Merriweather was fired (for the second time), Wilkins altered Merriweather's schedule at the last minute because he somehow knew that Merriweather would get upset and leave work, thus giving Wilkins the pretext he needed to fire her. In other words, according to EEOC, Wilkins altered Merriweather's schedule because he was upset Merriweather refused to have sex with him, and Merriweather's anticipated reaction to the schedule change would give Wilkins reason to fire her.

Even assuming that Wilkins changed Merriweather's schedule because Merriweather would not have sex with him, this does not undermine the evidence that Wilkins terminated Merriweather because of her insubordination and failure to show-up for her scheduled work shift. The termination is the adverse employment action, not the

schedule change. In other words, Wilkins had a legitimate, non-discriminatory justification for terminating Merriweather's employment, unrelated to any animus regarding Merriweather's refusal to have sex with him. Wilkins could not know, with absolute certainty, that Merriweather would react in the manner that she reacted, thus giving Wilkins cause to fire her. If Merriweather had returned to work later that day, or at a minimum provided some sort of excuse or coverage for her shift, Wilkins would not have had cause to fire her. But Merriweather did not do any of these things, and her termination was justified.

In sum, EEOC has failed to provide evidence, direct or circumstantial, which links Merriweather's termination to Merriweather's refusal to engage in sexual relations with Wilkins.[5] V&J's motion for summary judgment is granted on this claim.

## III.  RETALIATION

### A.    Direct Method

To state a retaliation claim under the "direct method," EEOC must produce evidence of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two. *See Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003).

#### 1.    Protected Activities

It is undisputed that Merriweather did not file an EEOC complaint until after her termination. Generally, a plaintiff must "engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity. . . . An

---

[5]  To the extent that EEOC pursues a "Quid Pro Quo" theory with regard to Merriweather's first termination, EEOC fails to establish the appropriate causal link between Merriweather's rejection of Wilkins' advances and her termination. Merriweather was terminated for a no-call/no-show violation.

employer cannot retaliate if there is nothing to retaliate against." *Durkin*, 341 F.3d at 614-15. Nonetheless, EEOC argues that Merriweather's numerous complaints to various shift and assistant managers at the restaurant qualify as "statutorily protected activities." While it is true that an "official complaint with an employer may constitute statutorily protected activity under Title VII," *see Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997), Merriweather never filed an official complaint through V&J's complaint mechanism. The Seventh Circuit has yet to resolve whether informal complaints constitute protected expression when a formal complaint procedure is in place. *See, e.g., Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004) (declining to resolve "whether Rhodes engaged in protected activity because she failed to comply with IDOT's request to formally complain in writing"); *Krause v. City of LaCrosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (noting Seventh Circuit has yet to rule on whether informal complaints constitute protected expression). While the Seventh Circuit has suggested, albeit in *dicta*, that informal complaints are not "protected activity," *see Durkin*, 341 F.3d at 615 (while the record is "replete with examples of her complaints . . . [plaintiff] did not utilize the City's policy for reporting harassment because she believed it would accomplish nothing"), other courts have held that such complaints are protected. *See, e.g., Pastran v. K-Mart Corp.*, 210 F.3d 1201 (10th Cir. 2001); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 495, 506 (9th Cir. 2000); *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981); *see also Walls v. Turano Baking Co.*, 221 F. Supp. 2d 924, 931 (N.D. Ill. 1998).

EEOC also argues that Wilkins retaliated against Merriweather because he knew or suspected that Merriweather was *going* to talk to V&J upper management (specifically, V&J President Valerie Daniels-Carter) and complain about Wilkins' harassment on the day of the last-minute schedule change. This scenario at least arguably states a claim for "anticipatory" or "preemptive" retaliation. *See, e.g., Johnson v. ITT Aerospace/Communications*, 272 F.3d 498, 500-01 (7th Cir. 2001); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993) (action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact). Therefore, the Court will presume that Merriweather's various alleged informal complaints, along with her alleged intention to complain to V&J officials on the day of the schedule change, constitute "protected activities" for purposes of a retaliation claim.

EEOC further argues that Wilkins' alleged statement that he was firing Merriweather because she "brought her mother into her business at V&J" is direct evidence of discrimination. (PPFF, ¶ 258). According to EEOC, this was a "direct reference to Merriweather's complaint about sexual harassment, as conveyed to Wilkins by McBride after Merriweather's mom visited the restaurant." (EEOC's Brief in Opposition, p. 16, citing PPFF, ¶ 254-55). The Court is unaware of any case which stretches the concept of "protected activity" to include complaints made to family members who are not co-workers. The Court declines the invitation to make such a holding.

More interesting is the claim that Wilkins terminated Merriweather because of *her mother's* complaint to McBride. The statute, on its face, does not cover a claim that an

employee (Merriweather) was terminated because a third-party (Merriweather's mother) complained about the employee (Merriweather) being harassed. The relevant provision states that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because he has opposed any practice made an unlawful employment practice by this subchapter*." 42 U.S.C. § 2000e-3(a) (emphasis added).

Most courts follow the plain language of the statute and hold that a claim for "third-party" retaliation is not actionable. *See, e.g., Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561 (3rd Cir.), *cert. denied*, 537 U.S. 824 (2002) (addressing nearly identical provisions of other statutes and noting Title VII rules apply); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813 (8th Cir. 1998); *Holt v. JTM Industries, Inc.*, 89 F.3d 1224 (5th Cir. 1996), *cert. denied*, 520 U.S. 1229 (1997); *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F. Supp. 2d 1123 (D. Kan. 2002); *Thompson v. North American Stainless*, 435 F. Supp. 2d 633 (E.D. Ky. 2006); *Singh v. Green Thumb Landscaping, Inc.*, 390 F. Supp. 2d 1129 (M.D. Fla. 2005). However, at least two courts have broadly interpreted the language of the statute to encompass claims of retaliation for complaints made *on behalf* of the plaintiff, which is the situation in the case at bar. *See EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545-46 (6th Cir. 1993) (the words in the statute should be broadly construed to include a claim in which an employee, *or his representative*, has opposed any practice made an unlawful employment practice); *Baird v. Rose*, 192 F.3d 462, 471 n.10 (4th Cir. 1999) (retaliation for mother's complaint actionable where mother was acting on plaintiff's behalf).

While there is no Seventh Circuit precedent directly on point, the Court agrees with the cases that follow the plain language of the statute. The language itself represents a clear expression of congressional intent. "Read literally, the statutes are unambiguous – indeed, it is hard to imagine a clearer way of specifying that the individual who was discriminated against must also be the individual who engaged in protected activity." *Fogleman*, 283 F.3d at 568. For "whatever reason, [Congress] chose to write the statute to require that the person retaliated against also be the person who engaged in the protected activity." *Higgins v. TJX Companies, Inc.*, 328 F. Supp. 2d 122, 124 (D. Me. 2004). While the policy behind Title VII favors liberal construction, any conflict with the plain meaning of the statute should be resolved in favor of the plain meaning. *See Fogleman*, 283 F.3d at 569; *Singh* at 1138.

Furthermore, construing the statute according to its plain meaning would not lead to absurd results or undermine the legislative intent. Congress may have thought that barring third-party retaliation was unnecessary or that permitting third-party claims would open the door to frivolous lawsuits. *See, e.g., Higgins*, 328 F. Supp. 2d at 124 n.3; *see also Singh*, 390 F. Supp. 2d at 1138 (Congress may have feared that expanding the class of potential anti-discrimination plaintiffs beyond those who engaged in protected activity would lead to frivolous law suits and would impinge upon an employer's ability to fire at-will employees).

Therefore, Merriweather's alleged complaints to her co-workers, and her alleged "plan" to complain to V&J upper management, are protected activities for purposes of the

retaliation claim. However, Merriweather's complaint to her mother, and her mother's complaint to McBride on her behalf, are not protected activities.[6]

## 2. Causal Connection

EEOC attempts to state a circumstantial case of discrimination with respect to the retaliation claim. However, EEOC provides only speculation as to whether Wilkins actually knew about Merriweather's alleged complaints[7] or her alleged "plan" to talk to Daniels-Carter on the day of her schedule change. "It is not sufficient that [the employer] *could* or even *should* have known about [the plaintiff's] complaints; [he] must have had actual knowledge of the complaints for [his] decisions to be retaliatory." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004). EEOC's repeated assertion that *McBride* knew about the complaints and the plan, and that McBride was Wilkins' "eyes and ears" on the floor who told him everything, fails to support a reasonable inference that *Wilkins* knew about Merriweather's alleged protected activities. This evidence is purely speculative because it was *Wilkins* who testified that McBride "told him everything," not the other way around. (PPFF, ¶ 233; DR to PPFF, ¶ 233). Wilkins has no way of knowing if McBride really "told him everything," and McBride never confirmed or testified that she told Wilkins everything that happened on the restaurant floor. In other words, Wilkins lacks personal knowledge as to whether McBride actually

---

[6] Even if the complaint made by Merriweather's mother could be considered "protected activity," the evidence presented by EEOC that Wilkins was terminating Merriweather because she brought her mother "into her business" is not direct evidence of discrimination. The evidence more accurately suggests that Wilkins was upset that Merriweather's mother was disrupting the workplace by complaining on her behalf, a legitimate non-discriminatory justification for the termination.

[7] While there is evidence that Wilkins knew that Merriweather's mother complained about harassment, this does not support the inference that Wilkins knew about any other complaints. Furthermore, as noted above, a complaint to a family member (or a complaint by a family member) cannot be considered a protected activity.

told him "everything," and it therefore cannot be presumed that McBride told Wilkins about Merriweather's complaints. *See, e.g., Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002) (To the extent that Mr. Martin testified as to his "understanding," he lacked personal knowledge as to the punishment ordered, so the evidence is inadmissible and cannot create a factual issue for purposes of summary judgment).

Therefore, while Merriweather claims that she complained to McBride about Wilkins' harassment, McBride denies that she had any such conversations with Merriweather. (DR to PPFF, ¶ 51). Even taking Merriweather at her word, there is no concrete evidence to support the inference that McBride told Wilkins about Merriweather's complaints. "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Tyler v. Runyon*, 70 F.3d 458, 469 (7th Cir. 1995) (quoting *Hedberg v. Indiana Bell. Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)).

Therefore, because EEOC has failed to provide evidence to establish that Wilkins knew about Merriweather's complaints, the retaliation claim fails as a matter of law.

## B.    Indirect Method

To proceed under the "indirect method," EEOC must establish (1) plaintiff engaged in statutorily protected activity; (2) she was performing her job according to V&J's legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1031 (7th Cir. 2004).

EEOC fails to establish the fourth element of the prima facie case – that she was treated less favorably than similarly situated employees. EEOC offers Shawana Hollins and Vernell Staten as comparators. (PPFF, ¶¶ 273-276). To be similarly situated to the plaintiff, an individual must be "directly comparable to [the plaintiff] in all material respects." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). Courts consider "all of the relevant factors," including whether the employees (1) held the same job description; (2) were subject to the same standards; (3) were subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications – provided the employer considered the latter factors in making the personnel decision. Id. at 692-93. Staten is not similarly situated did not hold the same job description as Merriweather. Staten was an assistant manager, while Merriweather never advanced to the management level. (PPFF, ¶¶ 86, 110, 276). It appears that Hollins and Merriweather held the same job description as hourly employees below the management level. However, EEOC still fails to meet its burden of demonstrating that they are directly comparable. While Hollins has a varied disciplinary history that includes discipline for insubordination and a variety of no-call/no-shows, there is no indication that either Hollins or Staten engaged in the same behavior that resulted in Merriweather's termination – insubordination and the abandonment of a scheduled shift.

Therefore, EEOC's retaliation claim fails under the indirect method of proof.

## CONCLUSION

EEOC has stated an actionable claim of hostile work environment with respect to Wilkins' harassment of Merriweather at the 35th and Vliet store. However, V&J cannot be held liable for Wilkins' conduct under the affirmative defense set forth in

*Ellerth/Faragher.*  Furthermore, the *quid pro quo* claim is insufficient as a matter of law because V&J had a legitimate non-discriminatory justification for Merriweather's termination and EEOC has failed to produce evidence to support the inference that Merriweather was terminated because she rebuffed Wilkins' advances.  Finally, the retaliation claim must be dismissed because EEOC has failed to produce evidence to establish that Wilkins was aware of any Merriweather's complaints.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.  V&J's motion for leave to supplement the record [Docket No. 66] is **GRANTED**;

2.  EEOC's motion to supplement the record [Docket No. 68] is **GRANTED**;

3.  V&J's motion for summary judgment [Docket Nos. 40, 44] is **GRANTED**;

4.  V&J's motion for a protective order [Docket No. 30] is **DENIED** as moot;

5.  EEOC's motion to compel [Docket No. 24] is **DENIED** as moot; and

6.  This matter is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 3rd day of November, 2006.

**SO ORDERED,**

s/ Rudolph T. Randa

_____

**HON. RUDOLPH T. RANDA**
**Chief Judge**